and others. I have a letter from Mr. Affair. That's you, I guess, Counsel. Yes, Your Honor. Asking that four minutes from Mr. Schubenstein's argument be transferred to Spencer Capital and Mr. Schuben will have two minutes. I'm going to grab that request and proceed from  Mr. Affair. And we spoke with the courtroom deputy earlier and Ms. Abra Cooke will be making the first argument on behalf of the defendants' appellees and then I'll follow up with my two minutes when she's completed. Okay, proceed. Good morning, Your Honors. Sandra Houser from Denton's on behalf of the appellant Cabello Bay Reinsurance. May it please the court. The district court's order in this case dismissing Cabello's complaint should be reversed. There are a number of points that the district court simply got wrong as a matter of law. And with the court's permission, I'd like to preview the issues I'd like to address today before jumping into the substance. First, Cabello's claims here are based on a domestic securities transaction that is These claims clearly meet the requirements of Morrison since both parties entered into a binding contract and became irrevocably liable in the U.S. And these claims are not so predominantly foreign as to be impermissibly extraterritorial under Park Central. I hate to interrupt you, Judge Jacobs. I hate to interrupt you at the outset, but you say both became irrevocably bound in the United States under New York law. It is the it is the it is the receipt of the of the of a notice that that the other party has been bound, which which causes the irrevocable agreement. Well, here you didn't receive your client received the notice that that Spencer was signing on in Bermuda. Well, Your Honor, it is our position that the parties became irrevocably bound when Spencer through defendant Stein signed the subscription agreement, which I think indisputably happened in New York, and then deposited that agreement both by email and by mail back to Bermuda and under under federal law and also under New York law with the mailbox. How's there? Cabello didn't become irrevocably liable at that point because there were conditions in Section 4 and 4.8 was a condition that said that they had to pay for the shares upon closing. So at least I understand their independent grounds and Spencer still may have become irrevocably liable. But I find it hard to see your argument that your client was irrevocably liable when that condition was outstanding and completely in your client's control. Well, Your Honor, respectfully, I I hear your point about there being conditions upon closing. However, it is ordinary that there are perfunctory closing conditions in almost every deal. And the parties become bound at such point as there is a meeting of the minds and they can't revoke their assent. So here was the condition precedent to a contract. If your client doesn't pay, there is no contract. Right. It's in your client's control. So your client can avoid being irrevocably liable just by not paying for the shares. And then the whole agreement is off. Well, I think even defendants would admit here that once there was a signed agreement, once Cabello sent back the subscription agreement with its signature and the other side signed, there were there were performance issues to be sure both sides had to perform. But Cabello could be at that point. The fact in our briefing, having the discretion to either accept or reject a subscription agreement isn't a right to revoke that acceptance. And the closing conditions here were just mere formalities. Cabello was bound because it entered into an agreement that included an obligation to perform. If you look at the subscription agreement, section one point one, it the parties. I don't understand. I don't understand. Payment is a formality. It seems to be to be quite important. Well, yeah, payment is important for sure. But this court and the courts, the district courts within the circuit every day, see contracts that are entered into that are binding and irrevocable. In other contracts, it's not stated as a condition precedent is really what I'm asking. But on the issue of predominantly foreign, the district court relied on the fact that it's Cabello and Spencer are two Bermuda companies. Misrepresentation was directed to Enstar in Bermuda. The agreement was signed by your client in Bermuda. Title was delivered in Bermuda and the alleged shares in Spencer connected to Bermuda. So why aren't those Bermuda contacts sufficient to conclude that this is predominantly foreign? Well, your honor, the test in Park Central isn't a balance, a balancing test. It's looking at the totality and making a determination as to whether it's predominantly foreign. So the there are numerous steps in this transaction and aspects of the deal that are quite clearly in the U.S. that aren't at all minor. First, the fact that we've just been talking about the fact that the deal was accepted and signed in New York. The primer, which is the main sales document, was sent from New York, which under Cabello's pleading means the misrepresentation and omission on which the claims are based was made in New York. The agreement, again, was signed in New York by Mr. Stein on behalf of Spencer. Spencer had its principal place of business in New York. And the deal documents reflect that notices, including the subscription agreement itself, be sent to New York. All of Spencer's directors and executives were U.S. citizens. Mr. Stein is a U.S. resident. The securities that issue were subject to the U.S. securities laws and were issued altogether to finance the acquisition of U.S. assets. So if you take all of the facts together, I don't think it can fairly be said that this transaction was so predominantly foreign as to make it impermissibly extraterritorial. Let me ask you this. I mean, you say we're subject to U.S. securities laws. I take it that's because there's a clause in the contract that says they can't sell them without registering them. Is that correct? Yes, that is. But that's that's that's as between the two contracting parties. What what makes it subject? What makes this transaction or these shares subject to U.S. securities laws? But for the fact that the parties agreed that the buyer would not sell to anyone without registering them with the SEC? Well, I'm not sure that there is much more to it than that. Except I would say that the majority of shareholders, as as we understand it, are U.S. shareholders with only very few outside of the U.S. So I think it's an inherent and an important part of the transaction that they're covered by the U.S. securities laws. It's not our position that that fact standing alone makes this a U.S. transaction. As I see the structure of this, it looks as though it's structured so that it would not be subject to the U.S. securities laws, which is perfectly fine. Only then you get the question of why Congress would want to make the courts would want to open the doors of the U.S. courts to dealing with a controversy over a transaction where the parties took care to avoid American securities laws. Well, I don't think it's the case that the parties took care to avoid the U.S. securities laws when the agreement itself makes reference to the U.S. securities laws. And there is a clear, in our view, misrepresentation regarding those securities made out of the U.S. to a variety of investors, including primarily U.S. investors. So I don't think this is at all what was envisioned by Park Central in envisioning a transaction that is so predominantly foreign. This court's case law in that regard points to all kinds of different circumstances where really the heart of the transaction is outside the U.S. Here we have a U.S. individual on behalf of a company with its principal place of business in New York signing up subscribers based on a representation that Covello contends just simply isn't true. You point out that parties can become irrevocably bound if the if the if the if the. If the seller in this instance signs the the subscription agreement and deposits it in the mail here and there's law, of course, to that effect here, it's by email. Is there any case that that talks about email? Well, I would first point out, Your Honor, that the subscription agreement was sent both by mail from New York and by email by Mr. Stein. So I don't think we necessarily get to that question. I believe that there's law that we cited in our briefs to that effect, which I can I can check for your honor and give you a specific reference. From New York, which I think satisfies the question. So let me I just want to ask you one question about reasonable reliance. Given that the agreement had a merger clause and the primer had all these disclaimers subject to revision without notice prepared for discussion purposes only. If there was any ambiguity in the incentive fee issue, clients obviously sophisticated investor. Why? Why would it have been erroneous for the district court to conclude that there could be no reasonable reliance based upon those types of disclaimers? Well, first, I would say that this is an issue that the district court didn't reach or address. But on the substantive point, this court's decision in the FIH case made very clear based on longstanding Second Circuit law that a general merger clause can't overcome reliance in the face of a very specific misrepresentation or omission. In those circumstances where there is a specific list of incorporated representations and warranties coupled with a merger clause, the situation may be different. But that isn't what happened here. Here, there's just a very general merger clause. And the statements in the primer are in general, right? Those aren't general statements in the primer. Well, in terms of the representations or in terms of the statement that Covello claims is subject to revision without notice prepared for discussion purposes only, you know, there's other ones as well. Well, you know, certainly there are those words in the primer. However, we have a situation here where the defendants deliberately concealed the truth about the management fees. And Covello reasonably believed that a management incentive fee would not include a windfall that was siphoned off of an increase in the results from the infusion of capital in the deal. So in that circumstance, a general kind of waiver or disclaimer can't overcome a very clear misrepresentation. It certainly can't overcome an omission like that. I see that I am over my allocated time. All right. Let's turn to counsel for Spencer Capital. Yes. Good morning, Your Honor. May it please the court, my name is Lee Haber-Cook on behalf of Defendant Appellee Spencer Capital Limited and Spencer Capital Holding Limited. As was noted, this case involves the sale of securities by one Bermuda company to another Bermuda company, which was advised by a third Bermuda company in a private transaction that closed in Bermuda. And, you know, but before I respond to Covello's arguments on this issue, I want to back up a minute and note a few points that provide the framework for this discussion, because the facts and circumstances of each case will be different. And so it's important to keep in mind that the overarching objective of Morrison was to avoid extraterritorial application of the securities laws. As set forth in Morrison, we begin with a presumption against extraterritoriality. And the Supreme Court in Morrison explicitly rejected the conduct and effects test and directed that the focus of the extraterritorial inquiry must be on the nature of the transaction in question. And so many of the factors that Covello is relying on here would be relevant under the conduct and effects test, but that test has now been stricken down by the Supreme Court. What Morrison said was it only applies, Section B only applies to transactions and securities listed on domestic exchanges and domestic transactions in other securities. Then in Absolute Activist and Park Central, this court provided guidance on how to make the determination of what is a domestic transaction in other securities where you have cases that are not publicly traded on any exchange. Under Absolute Activist, the first line of inquiry is whether irrevocable liability was incurred in the United States. But even if it was, Park Central requires the court to consider whether the transaction is necessarily, nevertheless, predominantly foreign. Let's not glide over that because that both parties became irrevocably bound when the acceptance was sent by mail from New York. So we submit that under New York contract law and as the district court judge found, the contract did not become binding at the earliest until the acceptance was communicated to the purchaser. But if that's done by email, it's instantaneous. Well, I would refer the court to the Schwartz v. Greenberg case, which is a New York Court of Appeals decision cited in Mr. Stein's brief. And it's not until it's actually communicated and received. It's communicated and received in Bermuda. If someone pressed a button in New York to send the email, but it didn't go through to Bermuda, then there wouldn't be a contract. What if it did go through? What if it did go through to Bermuda? Once it went through to Bermuda, that's the earliest point you could have a contract. But we also submit, and as the district court ruled, there were, as was noted in Section 4 and 5, a number of conditions before the transaction. But the conditions in Section 5 as it relates to your client's irrevocable liability were all out of your client's control. I looked at all of them. None of them are in your client's control. And we said in Junta that if the payment condition was in Covella's control as to their liability, but as to your client's liability in Section 5, completely out of your client's control, or am I missing something? No, I think under Section 5, one of the conditions is that we have to deliver the securities. And it's different than Junta because in Junta, what was the issue was whether they were waiting for the Bahamian regulator approval, which is totally out of our control. But I think we have to have a closing, at which case we show up with the securities to deliver. Where in Section 5? There's four conditions in Section 5. I don't see any that says this is conditioned upon delivery of the security. You can point it to me, but I don't see that. The agreement does provide that there will be a closing at which we will deliver the securities. Not under the conditions, not in Section 5. That's just in the general language of the agreement. Section 5 has no such condition. Well, right. So I'm looking actually at 4.4, that the company has to execute and deliver the related documents. Section 4 is when they become liable. Those are two independent grounds. Your client's liability based upon the conditions of Section 5, none of those are in your client's control is my point. Well, the reps and warranties have to be true, and I think some of the reps and warranties relate to things we do have control over. But nevertheless, even if we get away from the conditions, the earliest point, even if you said, okay, we were bound previously because the conditions were not in our control, which I still think they were because there had to be a closing under the contract. But surely, if there's a binding contract to deliver shares in exchange for a set price, failure to show up at the closing would be a breach, and the breach would support an action for damages. And those damages would be based on the fact that there was an irrevocable agreement to do the thing that one party refused to do. Well, that's why I'm saying that we could debate that, but at the earliest point that everybody was bound has to be when the acceptance was communicated. That's why I haven't even gotten to, I'm not focusing on 4 and 5, because I think if you look at the Schwartz versus Greenberg case, in that case, there was a transaction. This is a New York Court of Appeals case. The parties went to the closing. They both signed the agreement. When it came time to exchange the money, the seller said, no, I want the money in a certified check. So they each took their signed agreements. They left. They came back the next day, and the purchaser said, no, I don't want to do this anymore, and they tore up the contract. So I think there has to be a communication of the acceptance. Certainly, parties can rescind a binding contract. They don't want it anymore. They don't have it. We're not going to bother enforcing something that the parties don't want. But let me ask you this. How and to what extent are the U.S. securities laws affecting this transaction? Well, I think the point that was made about the U.S. securities laws is that it's the registration requirement, and in Covello's reply, they specifically say, Spencer asserts that where the shares were subject to the securities laws is not determinative of whether there was a domestic transaction, and they say Covello does not agree. Nor could it, because that argument was rejected in Absolute Activist and in Park Central, and in Park Central, the agreements were actually governed by U.S. law and had U.S. forum selection clause. So the fact that there has to be, as was pointed out, a registration where there's a transfer of shares, that's not dispositive about whether the transaction is extraterritorial. The obligation to register if there's a transfer, where does that obligation come from? Does that arise from United States law, or does that arise from a provision in the contract? There is a provision in the contract. It states that the subscription agreement informs investors that if they want to transfer them, they have to register them. Whether that's just something in the contract or whether it's a requirement of U.S. law, I don't know. Now, if they don't register them, they just keep them, are they subject to U.S. securities laws? Well, we submit that they're not, unless they want to. That's why I'm asking you. Yeah, I don't know what securities laws they would be subjected to, because the transaction is a Bermuda transaction, Bermuda securities. I know I'm getting down on my time. I would just address the point about reliance, and our position there on reliance is that this case is not like the FIH case, it's more like the ATSI case, and that the question that was raised about whether there's an ambiguity, I think all the cases are clear. If there's some sort of ambiguity that puts someone on notice, then you have to have some duty to inquire, and they should have looked at the IMA. The reason for that is the incentive fee is described as 20% of profits above 8% growth in book value per share. On its face, that doesn't make sense, because profits and book value are two different concepts. Book value includes retained profits, correct? Right, right. But how do you say 20% above 8% growth in book value per share? That's so ambiguous, that would give you reason if you really, if it was material to you, you should ask for the IMA, which there's no question what the IMA says, and there's no question the fee was paid in accordance with the IMA. Thank you, counsel. Mr. O'Hare, you have two minutes. Good morning, your honors. May it please the court. I'm going to address just a couple of separate issues, two of which apply solely to Shubinstein. The first issue is that under Section 29B, which seems to be in part the plaintiff's main claim, that claim can't stand against Shubinstein for a couple of reasons. In order to have a Section 29B claim, as also set forth in the plaintiff's papers, you need a contract that is involved in a prohibited transaction. Now, let's assume for the moment there's a contract here that implicates the securities laws for purposes of my argument. But you need to have the plaintiff being in contractual privity with the defendant, in this case, Shubinstein. And then the plaintiff has to show that it's within the class of persons that Section 29A was designed to protect. There's no question that Mr. Shubinstein was not in contractual privity with the plaintiff. And indeed, if you look at the complaint here, at paragraph 46, the amended complaint, the plaintiff only pleads that the party that was in contractual privity with the plaintiff is Spencer Capital. Throughout its brief, they do not take issue at all, Covello does not, with our position, our separate point in our brief, that there was no contractual privity and, therefore, that 29B should fall. So we'd say even with respect to our arguments in the brief, they haven't even joined issue on that point. Separately, we think as the alternative basis to dismiss the amended complaint, that the plaintiff has failed to state with particularity that there was any scienter involved in the matters at hand. What we're really focused on here is just a simple transfer of a document. It was preliminary in its scope. It was sent by email. It was 39 pages in length. It was essentially a marketing piece. The only allegation in the whole complaint, if you really boil it down to its essence, is that this email was forwarded by Schubenstein and that the investment committee of NSTAR that was working on behalf of the plaintiff in the case apparently reviewed the primer. There's no allegation whatsoever that there were any details discussed with respect to the primer. There's an allegation in the complaint that there was a phone call from Mr. Schubenstein to the plaintiff in which there was a pitch, if you will. There's no allegation whatsoever that anything was discussed with respect to the primer and, in particular, with respect to the incentive fee. And so we say that when you really focus on what this case is about, it's essentially an email in which a primer was attached pre-transaction. And that segues into reliance. I see I'm over my time, but if I can continue for another 30 seconds, I'll end quickly. 30 seconds, you can continue, and that's it. Thank you, Judge. So as to reliance, this is just to piggyback a little bit on what Ms. Cook has said. The reliance here, they've put it in issue. That's our position. And they put it in issue because in their pleadings and even in their motion papers, they've said they wouldn't have entered into the transaction had they known that this is the way that this incentive fee would have been calculated. Well, it was a separate point in the primer. And if this indeed is what counsel has said in argument tonight, that we were attempting to hide that, well, there was first, if the incentive fee was so important it's separate from the management fee, it could have easily been checked by simple due diligence by, as Ms. Cook said, just asking for the investment management agreement. That would have explained it. And it defies logic to think that Schubenstein would have attempted to hide this when at the first time that the calculation of the incentive management fee had to take place, which was several months after the transaction, it would have been patently obvious to everyone. And so it just defies logic that this, this one piece of fact was somehow hidden from sophisticated parties here. And they had the ability to check and to, and to conduct their due diligence would have readily revealed this fact. Thank you, counsel. Ms. Hauser, you retain two minutes for rebuttal. I'd like to ask if we conclude that this is a foreign transaction, could this action be brought in Bermuda? Interesting question, Your Honor. And one that one that I haven't looked at, to be honest, I don't see a reason why it couldn't be brought in Bermuda. I'd like to turn back to. I'm sorry, I just have one short question. You say that this text, 25% of profits above 8% growth in book value per share is a misrepresentation. What did your client think it was representing? Well, what I would say to that your honor is that my client reasonably understood the term profits to mean financial gain due to operational activities or return on investments. Profits clearly don't encompass an increase in market cap due to the issuance of new shares. That's of course not profit. Profits are not reflected in book value per share, except to the extent that the profits are retained. But I don't think that anything here would have thrown up a storm warning or  I think what is actually intended here, including the use of the word profits is that Spencer would pay Spencer management, an extraordinary management fee when Spencer itself was operating at a loss. And if you look at the facts that are alleged in the complaint, and this ties into the Ciantra point as well as reliance, the performance fees totaled over 4.4 million or 7% of the funds raised at a Spencer was operating at a loss. I mean, your adversary does have a point in saying that, that since this is essentially incomprehensible or, or nonsensical how could your client have, have relied on it knowing what it means and without making further and without making any further inquiry? Well, I think what I would say your honor is that my client took a representation that there would be a management fee based on, based on profit based on the performance of the investment. And that is entirely ordinary and not the kind of thing, even a sophisticated investor would think to do detailed due diligence on. We accept that there's an, a performance management fee, not that the company is going to pay itself. Many financial managers take a percentage, not just a small percentage, but a percentage of the entire amount of the investment every year. That's not related to profit. That is true. But here there's a, there's the very specific reference to profit. And if it were going to be the case that there was a management fee paid on something on, on just raising additional capital I think it's fair to say that no investor would just simply accept that. So to my mind, I'm sorry, I'm taking up all of your time. I would just like, thank you, your honor. I appreciate the questions and it's important that we answer them. I would just like to address a few of the points that came up in opposing counsel's argument. First, going back to the point of the agreement, I think the central point, and I think it was judge Bianco that raised it, if either party had not performed on this contract, there would have clearly been a breach. If you look at your decisions in Junta, an absolute activist on irrevocable liability, the question is whether something gives the parties here the right to walk away, the right to change their mind. Nothing in this agreement, none of the closing conditions on either side gave Spencer in particular, the right to change its mind. There was a meeting of the minds and agreement. I don't want to eat up more of your time. Judge Pooler's permission. I just wanted you to address the Schwartz case. What's your response to their reading of the Schwartz case and whether delivery was critical or not? Well, I think that the terms of the agreement here, if you read the terms of our agreement, they don't make, they don't condition a meeting of the minds. They don't condition. You're saying Schwartz, you're saying Schwartz, the terms of the agreement was different in its language. Is that what you're saying? I believe the agreement was different in its language, but I think you have to look at the terms of the agreement here, which do not provide anything about the agreement itself being conditional upon notice and receipt of notice, nor would it make any logical sense to imply that from the terms of the agreement, because notice can only happen after there actually is an agreement and meeting of the minds. I would just say, and I realize I'm over my time, but on the, on the point on 29B, I would just draw your honor's attention to the points in our brief that to state a claim under 29B, all that's required is the pleading of a violation of the exchange act, not the separate individual elements of a private right of action. We think that briefing is clear on that. It's a, it's a very interesting issue. I'm sorry, we didn't get more of an opportunity to discuss it, but I do think it's been briefed at length by the, by the parties and addressed by the fifth circuit and the third circuit and the cases we cited. Thank you, counsel. Thank you all for very lively argument. We'll reserve decision. Thank you.